Filed 7/10/26  Conservatorship of B.L. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of B.L. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY,<br><br>     Petitioner and Respondent,<br><br>v.<br><br>B.L.,<br><br>     Objector and Appellant. | A174460<br><br>(Contra Costa County<br> Super. Ct. No. P24-01135) |

After B.L. was declared gravely disabled for the second time, the court reappointed a conservator over B.L.'s person, found by clear and convincing evidence that B.L. lacked the capacity to consent to medical treatment, and precluded B.L. from refusing treatment related to his disability, including the administration of psychotropic medication.

On appeal, B.L. does not contest the court's grave disability finding but challenges the portion of the court's order precluding B.L. from refusing treatment related to his grave disability.  Because the order is supported by substantial evidence from which a reasonable trier of fact could have made the requisite findings by a high degree of probability, we affirm.

1

## BACKGROUND

In June 2024, then 60-year-old B.L. was discovered "laying" in a local park "in a completely disorganized state, covered with feces and insects." B.L. "was incoherent and unable to verbalize how he would take care of himself and provide himself with food, clothing and shelter." B.L. was placed on a "5150" hold[1] and taken by ambulance to the Contra Costa County Regional Medical Center, where he was diagnosed with schizophrenia.

Upon admission, B.L. was "initially very agitated and uncooperative." He admitted to auditory hallucinations and "talk[ed] about being under a tree with a woman with leprosy" but was otherwise "[u]nable to engage in further interview." B.L. agreed to take medication and was able to calm down "after some redirection from [medical] staff."

Over the following days, B.L. received "antipsychotics and mood stabilizer[s]" but generally "remain[ed] agitated, constantly wandering all over the unit and engaging in lots of behavioral outbursts," which required emergent "intramuscular injections and seclusion." B.L. would also clog toilets and "defecat[e] on milieu" and then "track[ ] feces all over the unit."

Healthcare workers continued to increase B.L.'s medication and, after approximately a month, B.L.'s "psychotic symptoms [were] diminishing in intensity" and he "appear[ed] to be stabilizing."

---

[1] A 5150 hold refers to Welfare and Institutions Code sections 5150 and 5151, which permit a person to be taken into custody and detained for 72 hours if there is probable cause to believe that person is a danger to themself or others because of a mental disorder. (*Folsom Police Dept. v. M.C.* (2021) 69 Cal.App.5th 1052, 1057.) Further undesignated statutory references are to the Welfare and Institutions Code.

## I. Initial Conservatorship

In July 2024, the Public Guardian for Contra Costa County (the Public Guardian) petitioned for appointment of a temporary conservator and conservatorship over B.L.'s person pursuant to the Lanterman-Petris-Short Act (the LPS Act; §§ 5350, 5352, 5352.1). A temporary conservator was appointed, and B.L. was transferred to a secured healthcare facility (Crestwood) pending hearing. At the subsequent hearing on the petition for conservatorship, B.L. objected and demanded a trial, which commenced on August 26, 2024.[2]

On the second day of trial (August 27, 2024), B.L. agreed to the establishment of a conservatorship with the understanding that it would last up to one year, beginning that day. B.L. also requested an intervening placement hearing, seeking a step down to an unsecured board and care facility. The court set a placement hearing for September 2024, at which it found that a board and care facility was the least restrictive placement. The court also imposed several disabilities including, without objection, a disability prohibiting B.L. from refusing "treatment related specifically to [B.L.'s] being gravely disabled, including psychotropic medications" and prohibiting B.L. from refusing "routine medical treatment unrelated" to being gravely disabled.

By December 2024, B.L. had been accepted into a board and care facility, but in January 2025, his transfer was "paused by the facility" due to a "medical issue." At the recommendation of his doctor, B.L. underwent an endoscopy, which showed that B.L. had recently ingested "a bible verse, a dollar bill, and playing cards." B.L. admitted to eating the bible verse

---

[2] B.L. initially demanded a jury trial but subsequently waived that right and agreed to a court trial.

because " 'I thought God would help me' " but denied ingesting the other items.[3] B.L.'s doctor expressed concern that his pica behavior would " 'progress into something unmanageable once [B.L.] steps down to a lower level of care.' " Based on the endoscopy results, the board and care facility rescinded B.L.'s admission, "stating PICA is outside of their scope of practice."

At a subsequent placement hearing in April 2025, the parties informed the court that B.L. had exhausted his options for less restrictive board and care facilities, which were unable to manage B.L.'s medical concerns. Thus, the Public Guardian filed a notice to change B.L.'s placement level to a more restrictive placement. B.L. objected, and the court set a contested hearing.

## II. Reappointment Petition

In June 2025, the Public Guardian filed a petition for reappointment of a conservator over B.L. with declarations from two licensed physicians, who opined that B.L. remained gravely disabled due to a "medical disorder." B.L. requested a court trial, and the parties agreed to first try the reappointment petition with the placement hearing "trailing." The trial occurred between July 21 and July 23, 2025.

After hearing motions in limine, the court admitted over objection B.L.'s medical records from the Contra Costa County Regional Medical Center and Crestwood.[4] The Public Guardian called two witnesses:

---

[3] B.L. subsequently stated that he had eaten about 12 pages of the Bible. A social worker also discovered results from a 2017 colonoscopy that "indicated bible verses were found inside of [B.L.'s] digestive tract at that time." We will adopt B.L.'s terminology and refer to the ingestion of nonfood items as pica or pica behavior.

[4] On appeal, B.L. does not raise any challenges to the trial court's rulings on his objections or any specific medical record admitted or excluded, thus we do not detail the court's in limine rulings in this opinion.

4

stipulated expert Shahbaz Khan, M.D. and deputy conservator Jamie Flores. B.L. did not present any witnesses or documentary evidence.

### A. Expert Testimony of Dr. Khan

Khan, a physician specializing in psychiatry, worked in private practice and part time at Contra Costa County's adult mental health clinic, providing evaluations, diagnosis, and treatment for patients with severe mental illness. Khan met with B.L. twice before the July 2025 trial—in August 2024 and in June 2025, each time for 45 minutes—at the request of the Public Guardian. Additionally, Khan reviewed notes from B.L.'s conservators, B.L.'s medical records, and B.L.'s " 'Mental Health Face Sheet,' which summarizes . . . [B.L.'s] mental health facility encounters . . . over the past 10, 15 years."[5]

Based on medical records and interviews with B.L., Khan believed B.L. suffered from "chronic schizophrenia." Schizophrenia is a "severe," "chronic," and "long-term" impairment of "the brain functioning and psychological functioning that is characterized by hallucinations, delusions, disorganization of thoughts, catatonic-type behaviors, [and other] negative symptoms." In contrast to "other situations where people do hear voices," someone experiencing chronic schizophrenia is unable to recognize that the voices are not real and believes that the voices "truly are talking to this person." Khan described this as a lack of " 'insight,' " which is the ability "to distinguish whether one's experience is [an] impairment of their psychological processes, thought process, or not." Khan explained that delusions "are another category of symptoms of severe impairment in schizophrenia where a person has [an] alteration in their belief system, which is psychotic in nature, in

---

[5] Khan clarified that "encounters" referred to "hospitalizations, stays in mental health facilities," and other records "reflecting [an] inability or ability to be independent or not independent in terms of shelter and living."

5

which a person believes in things that are not real and typically are negative in character."[6]

Khan testified that psychiatric medications are the primary means of treating the symptoms of schizophrenia with additional support from therapy and counseling. According to Khan, while counseling can help "in managing the symptoms," the principal treatment is psychiatric medication to "help reduce both the intensity, frequency, and the symptoms itself."

Khan then identified and discussed four of the "six different" psychiatric medications B.L. was prescribed and taking according to medical records: clozapine, haloperidol, valproic acid, and benztropine. Clozapine addresses "pretty much all" the major symptoms of schizophrenia, including hallucinations, delusions, and mood instability. B.L. was prescribed "divided doses," meaning he would take different doses of clozapine twice during the day. Due to its side effects, individuals taking clozapine require at least monthly blood tests to obtain the medication, which is dispensed in monthly or weekly supplies. Haloperidol, which B.L. took daily, treats delusions and hallucinations and is given "as an adjunct if another primary medication, like clozapine, may not be enough for the treatment of schizophrenia." Valproic acid, which B.L. took twice daily in different quantities, helps stabilize mood swings and reduce agitation. B.L. also took two pills a day of benztropine, which treats the physical side effects, such as stiffness, shakes, and tremors, brought on by the original psychiatric medications.

Turning to the interviews, Khan described B.L. as "polite and friendly" but displaying "symptoms of schizophrenia, like delusions of grandiosity,

---

[6] "[N]egative in character mean[s] something in the form of persecution, threats, and having this feeling and belief that people are out to get you, hurt you, attack you, or kill you, or demean you-type of experiences."

6

delusions of [persecution], and disorganization of thoughts." While B.L. was "alert and awake," "he did not seem to be able to recall what the date was or even what place he was at. He had some vague idea that he was in a hospital-type setting." B.L.'s "speech was disorganized" and "tangential at times," but B.L. "acknowledge[d] that he has schizophrenia" and "mentioned that he heard voices in the past." When asked about paranoia, B.L. gave Khan "different answers at different times," either disavowing paranoia or admitting to "some amount of paranoia where the voices would put him down and threaten him and say negative things."

Khan testified that B.L. "has not lived independently ever" and that B.L. had spent "a very long period of time" in "different facilities – mental health facilities, hospitals," in addition to experiencing homelessness "almost for 31 years or so." As for income, B.L. told Khan he received "Social Security income" and mentioned "several times" that he was a famous guitarist playing for bands like "Van Halen and Led Zeppelin."[7] However, B.L. claimed he did not have "access" to his music income, which Khan described as "delusion upon delusion, of having both grandiosity as well as persecution where that money was somehow being held back."

When asked about how to procure clothing and food, B.L. indicated "he could go to clothing stores" and "to grocery stores or buy sandwiches." B.L. "didn't have any clear plan" for shelter and "talked about somebody finding him shelter or housing, one form [or] another, but no clear answers, no clear plans."

---

[7] Khan "reality tested" this belief by asking follow-up questions. B.L. claimed he was Jimmy Page, and his roommate was Robert Plant. Khan described B.L. as being "determined and comfortable" in his belief that he was Jimmy Page; thus, Khan "labeled it as a grandiose delusion." At a different meeting, B.L. claimed to be the lead guitarist of Van Halen.

Khan asked B.L. if he would take medication on his own, and B.L. agreed. Still, according to Khan, medical records reflected "bizarre types of behaviors," such as "yelling in the hallway [of the hospital] naked," which Khan opined were "indicative of lack of insight; lack of understanding into his condition; lack of ability to remain within social norms of decency, clothing; and making delusional statements." Khan noted that B.L. was, at the time, "in a supervised facility" with "therapeutic dosages [of medication] being prescribed" but "still [having] breakthrough symptoms of agitation, aggression, unpredictable, bizarre behavior," which " reflect[ed] . . . a very severe case of a severe mental disorder."

Khan also believed B.L.'s pica behavior was "very indicative of not just bizarre, but dangerous behavior." Medical records from May 2025 noted that B.L. "swallowed some papers" because, as B.L. told the social service worker at the time, " 'that is my medication.' " Khan explained "that a person with this much impairment is not able to understand and places themselves at risk because of the nonfood quality of whatever they're ingesting that can be toxic to their body." In Khan's opinion, B.L.'s inability to understand that his "symptoms arise from impairments of physical, psychological nature in the brain" was "indicative" that B.L. "does not have any plan to take medications, may not be cooperative in taking medications, and . . . may not be able to see or appreciate the benefit of medications."

Because of B.L.'s "breakthrough symptoms" despite a "significantly high amount of treatment," Khan opined that, if unsupervised, B.L. "would [not] continue taking [his] medications." B.L.'s breakthrough symptoms "lead to lack of insight and cooperation in taking medications and even some delay or disruption in any of [B.L.'s] medications can further deteriorate the level of cooperation and insight and make things worse."

8

Additionally, taking multiple medications in different quantities at different times of the day "is a very complex and difficult task for any person," so B.L.'s disorganization of thought increased the risk of a disruption in medication, which would "lead[ ] to more disruption and more impairment" and, in turn, would inhibit B.L.'s "ability to take care of [his] food, clothing, and shelter."

**B.  Testimony of Deputy Conservator Flores**

As deputy conservator for the Public Guardian, Flores oversaw the care of conservatees, including B.L., and ensuring they had food, clothing, and shelter.

Flores testified that B.L. said he would continue taking his medication and would participate in mental health treatment "in the community," but B.L. could recall the names of only two of his medications.  On several occasions, B.L. told Flores that he had eaten nonfood items, such as paper, dollar bills, and cotton balls.  B.L. explained he had eaten toilet paper and cotton balls because he was not "getting the pain medication that he needs" and "believed the toilet paper would help him."

When Flores asked how B.L. would get food if released to an unsecured facility, B.L. stated he would go to a food bank but could not explain how he would get there since he did not have a car.  B.L. did not have a plan for shelter if he was not conserved and stated he would go and buy his clothing but provided no plan or details.

**C.  The Court's Ruling and Imposition of Disabilities**

After hearing closing argument on July 23, 2025, the court found B.L. gravely disabled and granted the Public Guardian's reappointment petition, placing B.L. under a conservatorship until August 26, 2026.  Based on its review of the records, the court expressed a "concern as to [B.L.'s] ability to

9

continue to take medication when not supervised" and found that B.L.'s symptoms interfered with his ability to provide himself with food, clothing, and shelter.

The court then found the imposition of specific disabilities was supported "by clear and convincing evidence." As relevant to this appeal, the court imposed a disability prohibiting B.L. from refusing "treatment related specifically to [B.L.'s] being gravely disabled, including psychotropic medications," as well as a disability prohibiting the right to refuse "routine medical treatment unrelated to remedying or preventing the reoccurrence of [B.L.'s] being gravely disabled."

At the subsequent contested placement hearing in August 2025, the court found the least restrictive placement for B.L. was a secured facility.[8]

B.L. filed a timely notice of appeal.

## DISCUSSION

In this appeal, B.L. challenges only one aspect of the reappointment proceedings: "the trial court's order imposing the disability that removed [B.L.'s] right to refuse and consent to medical treatment related to his disability."

Once an individual has been declared gravely disabled, "[t]he LPS Act specifically authorizes the court to designate certain 'disabilities' to which a conservatee may be subject, including decisional disabilities relating to medical treatment." (*K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 170, citing § 5357.) These disabilities include "depriving the conservatee of '[t]he right to refuse or consent to treatment related specifically to the conservatee's being gravely disabled' " and of " '[t]he right to refuse or consent to routine

---

[8] Because B.L. does not challenge the placement determination, we do not detail the related testimony or proceedings.

10

medical treatment unrelated to remedying or preventing the recurrence of the conservatee's being gravely disabled.' " (*K.G.*, at p. 170.) Absent a court order imposing these disabilities, a conservator may not require a conservatee to consent to medical treatment. (*Ibid.* [noting an emergency exception not applicable here].)

"A court may order involuntary medication if clear and convincing evidence shows the conservatee is incompetent to give or withhold informed consent." (*Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 55.) In making that decision, the trial court considers "whether the conservatee lacks mental capacity rationally to understand the nature of the medical problem, the proposed treatment, and its attendant risks." (*Id.* at p. 56, citing *In re Qawi* (2004) 32 Cal.4th 1, 18.) If a patient's health would be "greatly jeopardized" without treatment and "the patient shows absolutely no appreciation of the gravity of his situation, an inference can be drawn the patient understands neither his illness nor the need for treatment." (*Conservatorship of Waltz* (1986) 180 Cal.App.3d 722, 728.)

On review, we evaluate "whether the record contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by [the] clear and convincing standard of proof." (*Conservatorship of S.A.*, *supra*, 57 Cal.App.5th at p. 56, citing *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, 1009.) We do not reweigh the evidence, and we presume all factual findings necessary to support the judgment were made. (*Conservatorship of S.A.*, at p. 56.)

Here, there is substantial evidence in the record indicating that B.L. lacked mental capacity to rationally understand the nature of his diagnosis, his medications, and the risks of stopping his medication. (*Conservatorship of S.A.*, *supra*, 57 Cal.App.5th at p. 56.) Although B.L. nominally

"acknowledge[d]" his schizophrenia diagnosis, Khan's uncontradicted testimony established that B.L. "lack[ed an] understanding of his condition." As Khan described, B.L. was "determined and comfortable" in his "grandiose delusions" and in the belief that his delusions were true. B.L. did not recognize that his symptoms (e.g., the voices and delusions) were not based in reality and was therefore unable to "see or appreciate the benefit of his medications." Accordingly, to the extent B.L. acknowledged that he suffered from schizophrenia, Khan believed B.L. was simply repeating "what others have told [B.L.]" and lacked any "actual understanding or insight that there is an impairment in the mental function." Due to B.L.'s lack of insight into his diagnosis, Khan opined that if B.L. was "released and independent in the community," he would not continue taking his medications.

Moreover, Khan explained that B.L. was experiencing "breakthrough symptoms of agitation, aggression, unpredictable, [and] bizarre behavior" while being prescribed "therapeutic dosages" of his medications "in a supervised facility." As Khan testified, B.L.'s medications required B.L. to "adher[e] to a regiment [that] is a very complex and difficult task for any person." However, B.L. was able to identify only "a couple" of medicines that he was taking and could not describe a plan for complying with his medicine regimen when living independently. Thus, Khan opined it would be "highly unlikely that [B.L. would] maintain a regular intake of these medications" without supervision. The resulting effect of a missed dose would compound "the frequency, amplitude, and intensity" of B.L.'s breakthrough symptoms and impede B.L.'s ability to understand his diagnosis or secure food, clothing, and shelter.

Additionally, B.L.'s pica behavior and belief that by consuming nonfood items he was taking his medicines greatly jeopardized B.L.'s health and "can

12

be toxic" to the body. During his interviews, B.L. stated that he ate pages from the Bible because he thought it was medication that "would help with the pain." As the unrebutted testimony of Khan established, while a patient may learn from medical professionals and family members that medications are likely to reduce their symptoms, their "core and fixed delusions and hallucinations don't go away." In B.L.'s case, his longstanding and continuous pica behavior, even while medicated in a secured facility, based on his belief that nonfood items would "help" him reflected "all dimensions of impairment, from being bizarre and illogical, to a nature of dangerousness in behavior that can lead to medical and physical harm."

In sum, the record reflects that B.L. not only fails to appreciate his diagnosis and need for medication but also continues to experience breakthrough symptoms that inhibit his ability to give informed consent. Moreover, B.L.'s ongoing pica behavior poses an independent risk that greatly jeopardizes B.L.'s health and, coupled with his inability to appreciate the gravity of his situation, supports an inference that B.L. lacks an understanding of his diagnosis and need for treatment. (*Conservatorship of Waltz, supra*, 180 Cal.App.3d at p. 728.) Thus, considering the clear and convincing standard, we conclude substantial evidence supports B.L.'s involuntary medication order.

B.L. argues to us that medical records show he was polite and compliant in taking his medications. While medical records support this statement in part, they also show that other times B.L.'s "mood fluctuat[ed] quickly from calm to angry and loudly yelling," and B.L. had been noted as "verbally aggressive" to at least one healthcare provider. Similarly, although B.L. often accepted medication when prompted, he could also become agitated and disruptive, requiring intramuscular injections and seclusion. Ultimately,

13

general politeness and partial compliance with directions do not demonstrate that B.L. rationally appreciated his diagnosis or the need for treatment, which is the focus of our inquiry on appeal. (*Conservatorship of S.A.*, *supra*, 57 Cal.App.5th at p. 56.)

Additionally, the three cases B.L. cites in favor of reversal are unhelpful: *Conservatorship of S.A.*, *supra*, 57 Cal.App.5th 48; *Conservatorship of D.C.* (2019) 39 Cal.App.5th 487; and *Conservatorship of Walker* (1989) 206 Cal.App.3d 1572. (See also *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1502 ["the specific facts" of other cases are "unhelpful" when reviewing for substantial evidence].) In *Conservatorship of S.A.* and *Conservatorship of D.C.*, the courts affirmed the involuntary medication orders where the conservatee lacked insight into their schizophrenia diagnosis, like B.L. (*Conservatorship of S.A.*, at pp. 51, 54–58; *Conservatorship of D.C.*, at pp. 490, 493–495.) In *Conservatorship of Walker*, the court remanded for further proceedings because, unlike in B.L.'s case, "the basis for the court's [involuntary medication] order . . . is unclear on this record." (*Conservatorship of Walker*, at pp. 1578–1579.) Thus, neither B.L.'s arguments nor his cited authority persuade us that the trial court's involuntary medication order lacks the requisite evidentiary support, taking into account the clear and convincing standard of proof.

## DISPOSITION

The order imposing the disability of involuntary medication as to grave disability is affirmed.

DESAUTELS, J.

We concur:

RICHMAN, ACTING P. J.

MILLER, J.

*Conservatorship of the Person of B.L.* (A174460)